| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|
| Don E. Lanson, SBN 163414<br>David V. Hadek, SBN 193154<br>ManfrediLevine<br>3262 E. Thousand Oaks Blvd., Suite 200<br>Westlake Village, CA 91362<br>Tel: (805) 379-1919<br>Fax: (805) 379-3819<br><br>*Attorney for Plaintiff* Mission Valley Bank | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| In re: | |
|---|---|
| Pacific Sun Entertainment, Inc. | CHAPTER 7 |
| | CASE NUMBER 1:11-bk-11813-MT |
| | ADVERSARY NUMBER |
| Debtor. | |

| Mission Valley Bank | *(The Boxes and Blank Lines below are for the Court's Use Only) (Do Not Fill Them In)* |
|---|---|
| Plaintiff(s), | |
| vs. | **SUMMONS AND NOTICE OF STATUS CONFERENCE** |
| Pacific Sun Entertainment, Inc. | |
| Defendant(s). | |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend yourself, you must file with the Court a written pleading, in duplicate, in response to the Complaint. You must also send a copy of your written response to the party shown in the upper left-hand corner of this page. Unless you have filed in duplicate and served a responsive pleading by _____, the Court may enter a judgment by default against you for the relief demanded in the Complaint.

A Status Conference on the proceeding commenced by the Complaint has been set for:

| Hearing Date: | Time: | Courtroom: | Floor: |
|---|---|---|---|
| ❑ **255 East Temple Street, Los Angeles** | | ❑ **411 West Fourth Street, Santa Ana** | |
| ☒ **21041 Burbank Boulevard, Woodland Hills** | | ❑ **1415 State Street, Santa Barbara** | |
| ❑ **3420 Twelfth Street, Riverside** | | | |

PLEASE TAKE NOTICE that if the trial of the proceeding is anticipated to take less than two (2) hours, the parties may stipulate to conduct the trial of the case on the date specified, instead of holding a Status Conference. Such a stipulation must be lodged with the Court at least two (2) Court days before the date set forth above and is subject to Court approval. The Court may continue the trial to another date if necessary to accommodate the anticipated length of the trial.

Date of Issuance: _____

**KATHLEEN J. CAMPBELL**
**Clerk of Court**

By: _____
          *Deputy Clerk*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*February 2010 (COA-SA)*                                                                 **F 7004-1**

Summons and Notice of Status Conference - *Page 2*                              **F 7004-1**

| In re | (SHORT TITLE) | CASE NO.: 1:11-bk-11813-MT |
|---|---|---|
| Pacific Sun Entertainment, Inc. | Debtor(s). | |

**NOTE**: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document described as _____
_____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

☐  Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| Date | Type Name | Signature |
|---|---|---|

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*February 2010 (COA-SA)*                                                                    **F 7004-1**

FORM B104  (08/07)                                                        2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Mission Valley Bank | Pacific Sun Entertainment, Inc. |

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>ManfrediLevine, c/o Don E. Lanson<br>3262 E. Thousand Oaks Blvd., Suite 200<br>Westlake Village, CA 91362          (805) 379-1919 | ATTORNEYS (If Known)<br>Ron E. Behling<br>925 North Garey Ave<br>Pomona, CA 91767          (909) 622-4431 |
|---|---|

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin | ☑ Debtor      ☐ U.S. Trustee/Bankruptcy Admin |
| ☑ Creditor    ☐ Other | ☐ Creditor    ☐ Other |
| ☐ Trustee | ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Non-dischargeability under §523(a)(2), §523(a)(4) and §523(a)(6)

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**

☐ 11-Recovery of money/property - §542 turnover of property

☐ 12-Recovery of money/property - §547 preference

☐ 13-Recovery of money/property - §548 fraudulent transfer

☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**

☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**

☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**

☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**

☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**

☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims

☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud

☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**

☐ 61-Dischargeability - §523(a)(5), domestic support

☒ 68-Dischargeability - §523(a)(6), willful and malicious injury

☐ 63-Dischargeability - §523(a)(8), student loan

☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)

☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**

☐ 71-Injunctive relief – imposition of stay

☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**

☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**

☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**

☐ 01-Determination of removed claim or cause

**Other**

☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*

☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☑ Check if a jury trial is demanded in complaint | Demand $ 380,000.00 |

Other Relief Sought

FORM B104 (08/07), page 2                                                    2007 USBC, Central District of California

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| **NAME OF DEBTOR**<br>Pacific Sun Entertainment, Inc. | | **BANKRUPTCY CASE NO.**<br>1:11-bk-11813-M |
| **DISTRICT IN WHICH CASE IS PENDING**<br>Central | **DIVISIONAL OFFICE**<br>San Fernando Valley | **NAME OF JUDGE**<br>Maureen Tighe |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| **PLAINTIFF**<br>Mission Valley Bank | **DEFENDANT**<br>Saeed Bin Sardar | **ADVERSARY PROCEEDING NO.**<br>1:10-ap-01520-VK |
| **DISTRICT IN WHICH ADVERSARY IS PENDING**<br>Central | **DIVISIONAL OFFICE**<br>Woodland Hills | **NAME OF JUDGE**<br>Victoria Kaufman |
| **SIGNATURE OF ATTORNEY (OR PLAINTIFF)** | | |
| **DATE**<br>3/8/11 | **PRINT NAME OF ATTORNEY (OR PLAINTIFF)**<br>David V. Hadek | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

1  DON E. LANSON, ESQ. SBN: 163414
   DAVID V. HADEK, ESQ. SBN: 193154
2  MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
   3262 E. Thousand Oaks Blvd., Suite 200
3  Westlake Village, CA 91362-3400
   Telephone: (805) 379-1919
4  Facsimile:  (805) 379-3819

5  Attorneys for Creditor
   MISSION VALLEY BANK

6

7

8            UNITED STATES BANKRUPTCY COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11 | In Re:                          | Case No.:  1:11-bk-11813-MT
                                     | Chapter 7
12 | PACIFIC SUN ENTERTAINMENT,
   | INC.,                           | **COMPLAINT BY CREDITOR**
13 |                                 | **MISSION VALLEY BANK TO**
   |             Debtor.             | **DETERMINE DEBT NON-**
14 |                                 | **DISCHARGEABLE**

15  MISSION VALLEY BANK

16               Plaintiff,

17     vs.

18

19  PACIFIC SUN ENTERTAINMENT,
    INC.
20               Defendant.

21

22

23       TO THE HON. MAUREEN TIGHE, THE CLERK OF THE UNITED

24  STATES BANKRUPTCY COURT, THE UNITED STATES TRUSTEE, THE

25  DEBTOR, HIS ATTORNEY OF RECORD, AND ALL INTERESTED

26  PARTIES:

27  / / /

28  / / /

MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

## THE PARTIES AND PROCEEDINGS

1.    Defendant PACIFIC SUN ENTERTAINMENT, INC., is a Debtor in this Chapter 7 case (the "**Debtor**").  Plaintiff, MISSION VALLEY BANK, a Creditor herein, is a California corporation with its principal place of business in Los Angeles County, State of California.

2.    Debtor voluntarily filed the captioned case on February 11, 2011.

3.    The deadline for objecting to the Debtor's discharge was scheduled by the Court for May 16, 2011.

## JURISDICTION AND VENUE

4.    This adversary proceeding is brought pursuant to Rule 7016 of the F.R.B.P. to determine the dischargeability of a debt under 11 U.S.C. §§ 523(a)(2),(4),(6) of the *Bankruptcy Code*.

5.    This Court has jurisdiction pursuant to 28 U.S.C. §157(b)(2)(I) and §1334, because this action is a core proceeding arising under Title 11.

6.    Venue is proper pursuant to 28 U.S.C. §1409(a)

## STATEMENT OF FACTS

7.    Debtor is, and at all times mentioned herein was, a corporation duly formed and existing under and by virtue of the laws of the state of California with its principal place of business located at 15801 Stagg Street, Van Nuys, California 91406.

8.    Saeed Bin Sardar ("**Sardar**") is, and at all times mentioned herein was, an officer, director and principal shareholder of Debtor.  Sardar personally guaranteed the obligations described herein.  On or about November 15, 2010, Sardar voluntarily filed a Chapter 7 petition, United States Bankruptcy Court, Central District of California (Woodland Hills Division), Case No. 1:10-bk-24394-VK ("**Sardar Case**").    Thereafter, on or about December 3, 2010, Plaintiff commenced an adversary proceeding against Sardar, Case No. 10-01520-VK ("**Sardar Adversary**").  As of the date of this complaint, the Sardar Case and

MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

1    Sardar Adversary are pending.

2        9.    On or about December 10, 2007, Plaintiff and Debtor entered into a

3    Business Loan Agreement, Commercial Security Agreement, and Promissory

4    Note whereby Debtor borrowed from and promised to repay to Plaintiff the

5    principal sum of $321,000, together with interest at the rate of nine percent

6    (9.00%).    True and correct copies of the Business Loan Agreement, Commercial

7    Security Agreement, and Promissory Note are attached hereto as Exhibits "1",

8    "2", and "3", respectively, and incorporated herein by reference.    Pursuant the

9    Commercial Security Agreement, the Debtor granted Plaintiff a security interest

10    in, among other things, computer equipment, including six (6) computer servers,

11    which is more particularly described in a UCC Financing Statement filed by

12    Plaintiff on January 22, 2008, with the California Secretary of State (the

13    "**Collateral**").    The monies advanced by Plaintiff pursuant to the Promissory Note

14    and Business Loan Agreement were for the purpose of Debtor's acquisition of the

15    Collateral.    The UCC Financing Statement is attached hereto as Exhibit "4" and

16    incorporated herein by this reference.

17        10.    Debtor defaulted under the Exhibit "1" Business Loan Agreement

18    and Exhibit "3" Promissory Note on June 10, 2008, by failing to make the

19    installment payment due on that date and all payments due thereafter.    As of

20    February 15, 2011, the outstanding principal and accrued interest due, owing and

21    unpaid from the Debtor to Plaintiff upon the Exhibit "3" Promissory Note totaled

22    $377,610.21.    Interest continues to accrue on the principal balance.[1]

23        11.    Pursuant to the terms of the Agreements attached hereto as Exhibits

24    "1" through "3", and specifically the Commercial Security agreement attached as

25

26    _____

27    [1]  On September 9, 2008, Plaintiff filed an action in the Superior Court for the County of Los Angeles,
Case No. PC 043604, against Sardar and the Debtor for breach of the agreements attached hereto, and, on May 9,
2009, Plaintiff obtained judgment against Sardar and the Debtor in the amount of $337,321.20.

28

_____
3
COMPLAINT BY CREDITOR MISSION VALLEY BANK TO DETERMINE DEBT NON-DISCHARGEABLE

1  Exhibit "2", the Debtor agreed to grant to Plaintiff a first priority security interest
2  in the Collateral.  Debtor expressly represented under the Business Loan
3  Agreement that Debtor had not entered into any security agreements concerning
4  the Collateral or otherwise granted any security interests in the Collateral. Under
5  the Commercial Security Agreement, the Debtor expressly represented and
6  warranted that it had marketable title to the Collateral, free and clear of any and
7  all liens and encumbrances except for the lien created by the Exhibit "2"
8  Commercial Security Agreement. Said Security and Business Loan Agreements
9  provide, <u>inter alia</u>, that in the event Debtor defaults in any indebtedness owed,
10 Plaintiff may take immediate possession of the Collateral, including accounts
11 receivable and inventory, equipment and intangibles.

12     12.    Plaintiff is informed and believes, and based thereon alleges that, at
13 the time the Debtor executed Exhibits "1" through "4", the Debtor had previously
14 granted security interests in the Collateral to other creditors, thereby effectively
15 diluting or destroying any security interest of Plaintiff in the Collateral.
16 Specifically, on or about December 7, 2007, Debtor executed an equipment lease
17 contract with Wirth Business Credit, Inc. ("**Wirth**"), and granted Wirth a security
18 interest in the same Collateral in which Plaintiff thereafter was granted a security
19 interest. Attached hereto as Exhibit "5" is a true and correct copy of the
20 equipment lease contract between the Debtor and Wirth which is incorporated
21 herein by reference.  On or about December 12, 2007, Wirth filed a UCC
22 Financing Statement with the California Secretary of State as to the Collateral, a
23 true and correct copy of which is attached hereto as Exhibit "6" and incorporated
24 herein by reference.  In addition, Plaintiff is informed and believes, and thereon
25 alleges, that the Debtor previously pledged the Collateral as security to other
26 creditors, including, without limitation, First Bank.  In executing the Business
27 Loan Agreement and Commercial Security Agreement, the Debtor represented to
28 Plaintiff that Plaintiff would be granted a first priority security interest in the

MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

COMPLAINT BY CREDITOR MISSION VALLEY BANK TO DETERMINE DEBT NON-DISCHARGEABLE

1  Collateral and that the Collateral was free and clear of any and all other liens and

2  encumbrances. Furthermore, the Debtor knew, at the time Exhibits "1" through

3  "4" were executed, that other creditors were previously granted security interests

4  in the Collateral and that Plaintiff's security interest would not have priority and

5  would be of little or no value. Plaintiff was unaware of the foregoing facts, and

6  the Debtor knew or suspected that if the foregoing facts were known to the

7  Plaintiff, Plaintiff would not proceed with the loan to Debtor as described herein.

8      13.    Plaintiff is further informed and believes, and thereon alleges, that

9  the Debtor did not in fact acquire the Collateral. Prior to Plaintiff making the loan

10  herein described, the Debtor represented to Plaintiff that the loan proceeds would

11  be used to purchase the Collateral by providing Plaintiff with an invoice from

12  Sharproduct, Inc., which purported to indentify the Collateral and its value.

13  Unbeknownst to Plaintiff, however, the Collateral was never acquired by Debtor

14  and never existed. Plaintiff is informed and believes, and thereon alleges, that the

15  invoice from Sharproduct, Inc. was fabricated, fictitious or otherwise false and

16  that the Debtor was aware of this fact. Rather than using Plaintiff's loan proceeds

17  to acquire the Collateral, Plaintiff is informed and believes, and thereon alleges,

18  that the Debtor misappropriated, converted and/or diverted the loan proceeds.

19      14.    The Debtor actively concealed from Plaintiff the fact that other

20  creditors were previously granted security interests in the Collateral and that

21  Plaintiff would not have a first priority security interest in the Collateral.

22  Moreover, the Debtor misrepresented to Plaintiff that the loan proceeds would be

23  used to acquire the Collateral, when, in fact, the Debtor had no intention and/or

24  knew that it had no intention of acquiring the Collateral. In doing the acts alleged

25  herein, the Debtor knew the true facts and did so with the intention to deceive and

26  defraud the Plaintiff and to induce the Plaintiff to act in reliance on the non-

27  disclosure, concealment and misrepresentations and to make the loan described

28  herein.

MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

1    15.    Plaintiff was ignorant of the true facts and, in reasonable reliance on

2    the non-disclosure, concealment and misrepresentation of the Debtor, was

3    induced to and did make the loan as described herein.  Had the true facts been

4    disclosed to Plaintiff before making the subject loan, Plaintiff would not have

5    made the loan.

6    16.    In addition to the foregoing, Plaintiff is informed and believes, and

7    based thereon alleges, that the Debtor willfully and maliciously diverted and/or

8    misappropriated (or otherwise allowed others to divert and/or misappropriate) the

9    Plaintiff's loan proceeds to the detriment of Plaintiff.

10    **FIRST CAUSE OF ACTION**

11    **(False Pretense, False Representation/Statement and Actual Fraud – 11**

12    **U.S.C. § 523(a)(2))**

13    **17.**    Plaintiff repeats, realleges and incorporates herein by reference the

14    allegations of paragraphs 1 through 16, inclusive, as though set forth at length.

15    18.    By reason of the Debtor's false pretense, false representation, actual

16    fraud and/or use of a materially false statement in writing, the Debtor induced

17    Plaintiff to make the loan described herein and is indebted to the Plaintiff therefor.

18    19.    As a direct and proximate result of the conduct of the Debtor,

19    Plaintiff has suffered damages in an amount exceeding $300,000.00 and

20    according to proof at the time of trial.

21    20.    Accordingly, the debt exceeding $300,000.00 owed from the Debtor

22    to Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(2).

23    21.    The conduct of the Debtor, in failing to disclose, actively concealing

24    and making misrepresentations to the Plaintiff, was committed with fraud, malice

25    and oppression and was otherwise despicable conduct carried on by the Debtor

26    with a willful and conscious disregard of the rights of the Plaintiff or with the

27    intention of depriving Plaintiff of property or legal rights.

28    / / /

**MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC**
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

COMPLAINT BY CREDITOR MISSION VALLEY BANK TO DETERMINE DEBT NON-DISCHARGEABLE

## SECOND CAUSE OF ACTION

### (Fraud, Defalcation, Embezzlement or Larceny – 11 U.S.C. § 523(a)(4))

22.    Plaintiff repeats, realleges and incorporates herein by reference the allegations of paragraphs 1 through 16, inclusive, as though set forth at length.

23.    By reason of the Debtor's embezzlement, diversion and/or misappropriation of Plaintiff's loan proceeds as alleged herein, the Debtor is indebted to Plaintiff in the amount of Plaintiff's loan to Debtor plus interest thereon.

24.    As a direct and proximate result of the conduct of the Debtor, Plaintiff has suffered damages in an amount exceeding $300,000.00 and according to proof at the time of trial.

25.    Accordingly, the debt exceeding $300,000.00 owed from the Debtor to Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(4).

26.    The conduct of the Debtor, in converting, diverting and/or misappropriating Plaintiff's funds and in failing to disclose, actively concealing and making misrepresentations to the Plaintiff, was committed with fraud, malice and oppression and was otherwise despicable conduct carried on by the Debtor with a willful and conscious disregard of the rights of the Plaintiff or with the intention of depriving Plaintiff of property or legal rights.

## THIRD CAUSE OF ACTION

### (Willful and Malicious Injury – 11 U.S.C. § 523(a)(6))

27.    Plaintiff repeats, realleges and incorporates herein by reference the allegations of paragraphs 1 through 16, inclusive, as though set forth at length.

28.    The Debtor willfully and maliciously, with fraudulent intent, induced Plaintiff to make a loan as alleged herein, thereby causing Plaintiff to suffer general and compensatory damages.    The Debtor willfully and maliciously converted, misappropriated and/or diverted the monies advanced by Plaintiff.

/ / /

MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

COMPLAINT BY CREDITOR MISSION VALLEY BANK TO DETERMINE DEBT NON-DISCHARGEABLE

MANFREDI, LEVINE, ECCLES, MILLER & LANSON, APC
3262 E. THOUSAND OAKS BLVD., SUITE 200
WESTLAKE VILLAGE, CALIFORNIA 91362-3400

29.    As a direct and proximate result of the conduct of the Debtor, Plaintiff has suffered damages in an amount exceeding $300,000.00 and according to proof at the time of trial.

30.    Accordingly, the debt exceeding $300,000.00 owed from the Debtor to Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(6).

31.    The conduct of the Debtor, in converting, diverting and/or misappropriating Plaintiff's funds and in failing disclose, actively concealing and making misrepresentations to the Plaintiff, was committed with fraud, malice and oppression and was otherwise despicable conduct carried on by the Debtor with a willful and conscious disregard of the rights of the Plaintiff or with the intention of depriving Plaintiff of property or legal rights.

WHEREFORE, Plaintiff prays for judgment as follows:

1.    An Order that the Debtor's indebtedness to Plaintiff constitutes a non-dischargeable debt pursuant to 11 U.S.C. §§ 523(a)(2), (4) and/or (6);

2.    An Order granting a non-dischargeable judgment in favor of Plaintiff against the Debtor, plus pre-judgment and post-judgment interest as provided by law, and reasonable attorneys' fees, costs and expenses;

3.    An Order granting Plaintiff such other and further relief to which it may be justly entitled;

4.    An award of punitive damages according to proof to discourage similar misconduct in the future; and

5.    For such other and further relief as the Court deems just and proper.

Dated: March 2, 2011                MANFREDI, LEVINE, ECCLES,
                                    MILLER & LANSON, APC

By: _____
DON E. LANSON
DAVID V. HADEK
Attorneys for Creditor
MISSION VALLEY BANK

COMPLAINT BY CREDITOR MISSION VALLEY BANK TO DETERMINE DEBT NON-DISCHARGEABLE

# EXHIBIT 1

| Principal | Loan Date | Maturity | Loan | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 321,000.00 | 12-10-2007 | 12-10-2012 | 101060U124 | 220 / 0039 | | JXS | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

rower:    PACIFIC SUN ENTERTAINMENT, INC.                 Lender:    Mission Valley Bank
          19425 LONDELUS STREET                                       Sun Valley Office
          NORTHRIDGE, CA 91324                                        9116 Sunland Blvd
                                                                      Sun Valley, CA 91352

HIS BUSINESS LOAN AGREEMENT dated December 10, 2007, is made and executed between PACIFIC SUN ENTERTAINMENT, INC.
Borrower") and Mission Valley Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from
ndor or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on
iy exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending
y Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting,
newing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans
all be and remain subject to the terms and conditions of this Agreement.

:RM. This Agreement shall be effective as of December 10, 2007, and shall continue in full force and effect until such time as all of
irrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and
arges, or until such time as the parties may agree in writing to terminate this Agreement.

JNDITIONS PRECEDENT TO EACH ADVANCE. Lender's obligation to make the initial Advance and each subsequent Advance under this
greement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related
>cuments.

    Loan Documents. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements
    granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security
    Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may
    require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

    Borrower's Authorization. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly
    authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided
    such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

    Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable
    as specified in this Agreement or any Related Document.

    Representations and Warranties. The representations and warranties set forth in this Agreement, in the Related Documents, and in any
    document or certificate delivered to Lender under this Agreement are true and correct.

    No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this
    Agreement or under any Related Document.

RESENTATIONS AND WARRANTIES. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each
ursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

    Organization. Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing
    under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which
    Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is
    doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to
    so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its
    properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at
    19425 LONDELUS STREET, NORTHRIDGE, CA 91324. Unless Borrower has designated otherwise in writing, the principal office is the
    office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to
    any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to
    preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances,
    statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business
    activities.

    Assumed Business Names. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names
    used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower
    hes business: None.

    authorization. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly
    authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any
    provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon
    Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

    nancial Information. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial
    condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to
    e date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in
    ich financial statements.

    gal Effect. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when
    livered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective
    ms.

    operties. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender
    d as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to
    of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements
    iting to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing
    cement under any other name for at least the last five (5) years.

    ardous Substances. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During
    period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release
    threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no
    owledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation,
    nufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the
    Lateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any
    on relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral
    ll use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the
    lateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and
    inances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to
    e such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the
    eement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be
    rued to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and
    ranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous
    tances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event
    wer becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender
    st any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer
    ing from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal,
    e or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement,
    ing the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or
    isfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by
    closure or otherwise.

    ion and Claims. No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes)

BUSINESS LOAN AGREEMENT

Loan No: 1010600124                    (Continued)                    Page 2

condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

Taxes. To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

Lien Priority. Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

Binding Effect. This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

AFFIRMATIVE COVENANTS. Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

Notices of Claims and Litigation. Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

Financial Records. Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

Financial Statements. Furnish Lender with the following:

Additional Requirements.
1) BORROWER'S AUDITED YEAR-END FINANCIAL STATEMENTS SUBMITTED ANNUALLY.
2) GUARANTOR TAX RETURNS, INCLUDING ALL SCHEDULES AND K-1's SUBMITTED ANNUALLY WITHIN 30 DAYS OF FILING.
3) GUARANTORS PERSONAL FINANCIAL STATEMENTS SUBMITTED ANNUALLY DUE MAY 1ST OF EACH YEAR.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

Additional Information. Furnish such additional information and statements, as Lender may request from time to time.

Insurance. Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

Insurance Reports. Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

Guaranties. Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
|---|---|
| SAEED SARDAN | $321,000.00 |

Other Agreements. Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

Loan Proceeds. Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

Taxes, Charges and Liens. Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

Performance. Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

Operations. Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

Environmental Studies. Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

Compliance with Governmental Requirements. Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

Inspection. Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

Compliance Certificates. Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

Environmental Compliance and Reports. Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or

application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

NEGATIVE COVENANTS. Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

Indebtedness and Liens. (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

Continuity of Operations. (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

Loans, Acquisitions and Guaranties. (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

Agreements. Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

CESSATION OF ADVANCES. If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Borrower fails to make any payment when due under the Loan.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency. The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Defective Collateralization. This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

Change in Ownership. Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

Insecurity. Lender in good faith believes itself insecure.

Right to Cure. If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the

BUSINESS LOAN AGREEMENT
(Continued)

Loan No: 1010600124

Page 4

EFFECT OF AN EVENT OF DEFAULT. If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

DEPOSIT ACCOUNT. Borrower covenants and agrees with Lender that while this Agreement is in effect, unless Lender shall otherwise give its prior written consent, Borrower shall maintain at all times, deposit accounts with Lender with compensating balances of not less than Eighty Thousand Two Hundred Fifty and 00/100 Dollars ($80,250.00). Borrower acknowledges and agrees that in the event the average balances decline by $80,250.00 as of the end of each fiscal quarter and so long as Borrower is in compliance with all the terms and conditions of the Agreement, and all Related Documents, the interest rate to be applied to the unpaid principal balance of the Loan shall be increased to 10.000% fixed rate.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

Consent to Loan Participation. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard in its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Notices. Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

Severability. If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

Subsidiaries and Affiliates of Borrower. To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

Successors and Assigns. All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

Survival of Representations and Warranties. Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

Time is of the Essence. Time is of the essence in the performance of this Agreement.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement.

Advance. The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

Agreement. The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

Environmental Laws. The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

GAAP. The word "GAAP" means generally accepted accounting principles.

Grantor. The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

Lender. The word "Lender" means Mission Valley Bank, its successors and assigns.

Loan. The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

Note. The word "Note" means the Note executed by PACIFIC SUN ENTERTAINMENT, INC. in the principal amount of $321,000.00 dated December 10, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

Permitted Liens. The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

Security Agreement. The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

Security Interest. The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED DECEMBER 10, 2007.

BORROWER:

PACIFIC SUN ENTERTAINMENT, INC.

By: _____
SAEED BARDAN, CHIEF FINANCIAL OFFICER of
PACIFIC SUN ENTERTAINMENT, INC.

By: _____
MOTTI GREEN, PRESIDENT of PACIFIC SUN
ENTERTAINMENT, INC.

LENDER:

MISSION VALLEY BANK

X _____
Authorized Signer

# EXHIBIT 2

COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $321,000.00 | 12-10-2007 | 12-10-2012 | 1010600124 | 220 / 0039 | | JXS | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

Grantor: PACIFIC SUN ENTERTAINMENT, INC.
19425 LONDELIUS STREET
NORTHRIDGE, CA 91324

Lender: Mission Valley Bank
Sun Valley Office
9116 Sunland Blvd
Sun Valley, CA 91352

THIS COMMERCIAL SECURITY AGREEMENT dated December 10, 2007, is made and executed between PACIFIC SUN ENTERTAINMENT, INC. ("Grantor") and Mission Valley Bank ("Lender").

GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds)

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL. With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

Enforceability of Collateral. To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

Location of the Collateral. Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

Removal of the Collateral. Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

Transactions Involving Collateral. Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

Title. Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

Repairs and Maintenance. Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

Inspection of Collateral. Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

Taxes, Assessments and Liens. Grantor will pay when due all taxes, assessments and liens upon the Collateral...

COMMERCIAL SECURITY AGREEMENT
(Continued)

Loan No: 1010600124 Page 2

the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

Compliance with Governmental Requirements. Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

Hazardous Substances. Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

Maintenance of Casualty Insurance. Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

Application of Insurance Proceeds. Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

Insurance Reserves. Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

Insurance Reports. Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value, and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

Financing Statements. Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

GRANTOR'S RIGHT TO POSSESSION. Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Grantor fails to make any payment when due under the Indebtedness.

Other Defaults. Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

Default in Favor of Third Parties. Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase

Defective Collateralization. This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Insolvency. The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

Adverse Change. A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

Insecurity. Lender in good faith believes itself insecure.

Cure Provisions. If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

RIGHTS AND REMEDIES ON DEFAULT. If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

Accelerate Indebtedness. Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

Assemble Collateral. Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender in a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

Sell the Collateral. Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

Appoint Receiver. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

Collect Revenues, Apply Accounts. Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

Obtain Deficiency. If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

Other Rights and Remedies. Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

Election of Remedies. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

Preference Payments. Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to

COMMERCIAL SECURITY AGREEMENT

Loan No: 1010600124                                    (Continued)                                              Page 4

shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Notices. Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

Power of Attorney. Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

Waiver of Co-Obligor's Rights. If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

Severability. If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

Successors and Assigns. Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

Survival of Representations and Warranties. All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

Time is of the Essence. Time is of the essence in the performance of this Agreement.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

Agreement. The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

Borrower. The word "Borrower" means PACIFIC SUN ENTERTAINMENT, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Collateral. The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

Default. The word "Default" means the Default set forth in this Agreement in the section titled "Default".

Environmental Laws. The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

Grantor. The word "Grantor" means PACIFIC SUN ENTERTAINMENT, INC..

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

Lender. The word "Lender" means Mission Valley Bank, its successors and assigns.

Note. The word "Note" means the Note executed by PACIFIC SUN ENTERTAINMENT, INC. in the principal amount of $321,000.00 dated December 10, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

Property. The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 10, 2007.

GRANTOR:

PACIFIC SUN ENTERTAINMENT, INC.

By: _____
SAEED SAADAN, CHIEF FINANCIAL OFFICER of

By: _____
MOTTI GREEN, PRESIDENT of PACIFIC SUN

Loan No: 1010600124          COMMERCIAL SECURITY AGREEMENT
(Continued)

Page 5

LENDER:

MISSION VALLEY BANK

X
Authorized Signer

# EXHIBIT 3

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Or... ...r | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $321,000.00 | 12-10-2007 | 12-10-2012 | 1010600124 | 220 / 0039 | | JXS | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * * *" has been omitted due to text length limitations.

| Borrower: | PACIFIC SUN ENTERTAINMENT, INC. | Lender: | Mission Valley Bank |
|---|---|---|---|
| | 19425 LONDELIUS STREET | | Sun Valley Office |
| | NORTHRIDGE, CA 91324 | | 9116 Sunland Blvd |
| | | | Sun Valley, CA 91352 |

Principal Amount: $321,000.00        Interest Rate: 9.000%        Date of Note: December 10, 2007

PROMISE TO PAY. PACIFIC SUN ENTERTAINMENT, INC. ("Borrower") promises to pay to Mission Valley Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Hundred Twenty-one Thousand & 00/100 Dollars ($321,000.00), together with interest at the rate of 9.000% on the unpaid principal balance from December 10, 2007, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in 60 payments of $6,684.39 each payment. Borrower's first payment is due January 10, 2008, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on December 10, 2012, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

PREPAYMENT; MINIMUM INTEREST CHARGE. Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Mission Valley Bank, Sun Valley Office, 9116 Sunland Blvd, Sun Valley, CA 91352.

LATE CHARGE. If a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $5.00, whichever is greater.

INTEREST AFTER DEFAULT. Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by 5.000 percentage points.

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:

   Payment Default. Borrower fails to make any payment when due under this Note.

   Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

   Default in Favor of Third Parties. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

   False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

   Insolvency. The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

   Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

   Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

   Change In Ownership. Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

   Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

   Insecurity. Lender in good faith believes itself insecure.

   Cure Provisions. If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

LENDER'S RIGHTS. Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES. Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

DISHONORED ITEM FEE. Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

COLLATERAL. Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: collateral described in a Commercial Security Agreement dated December 10, 2007.

SUCCESSOR INTERESTS. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES. Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Mission Valley Bank 9116 Sunland Blvd. Sun Valley, CA 91352.

GENERAL PROVISIONS. This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

PACIFIC SUN ENTERTAINMENT, INC.

By: _____
SAEED SARDAN, CHIEF FINANCIAL OFFICER of
PACIFIC SUN ENTERTAINMENT, INC.

By: _____
MOTTI GREEN, PRESIDENT of PACIFIC SUN
ENTERTAINMENT, INC.

# EXHIBIT 4

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGEMENT TO:    (Name and Address)

MISSON VALLEY BANK
9116 SUNLAND BLVD.
SUN VALLEY, CA 91352

08-7144794680

01/22/2008 17:00

FILED
CALIFORNIA
SECRETARY OF STATE

SOS

15630610002 UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME |
|---|
| PACIFIC SUN ENTERTAINMENT, INC. |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 19425 LONDELIUS STREET | NORTHRIDGE | CA | 91324 | USA |

| 1d. ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | CORPORATION | CA | | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|
| |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| MISSION VALLEY BANK |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9116 SUNLAND BLVD. | SUN VALLEY | CA | 91352 | USA |

4. This FINANCING STATEMENT covers the following collateral:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF, whether any of the foregoing is owned now or
acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind
relating to any of the foregoing; all proceeds relating to any of the foregoing
(including insurance, general intangibles and accounts proceeds).

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|---|

8. OPTIONAL FILER REFERENCE DATA
LOAN#1010600124

"EXHIBIT A"

| REP | PROJECT | P.O. NUMBER | SHIP DATE | SHIP VIA |
|---|---|---|---|---|
| | | 7805572 | | |
| QUANTITY | ITEM | DESCRIPTION | | |
| 6 | SYS | CGA Reliant WS7010 Intel Xeon Processor MP & Rack-Mount. Four (4) Intel Xeon MO 2.00GZ/2MB Processors. 4GB Addressable memory (8x512MB+2x512MB Redundant Memory. 36.4G Pluggable Ultra320 SCSI 10,000 rpm Universal Hard Drive (1"). Integrated Smart Array 5i Controller (Ultra 3 Support). Integrated Compaq NC7770 PCI-X Gigabit SErver Adapter. Two (2) Redundat Hot Plug 1150W/500W Power Supplies. Two (2) Redundant Hot Plug Fans. Intelli-Initiate 3.0, Core Manager 2.0 & ROM_based Setup Utility. | | |
| 6 | MT_LCD19 | MGC A710B 17" LCD MONITOR w/SPEAKER | | |
| 6 | RECYCLE | RECYCLE FEE | | |
| 1 | Labor | Service Fee for Delivery and Set Up | | |
| 1 | On-Site | On-site services | | |

1563961002

# EXHIBIT 5

**WIRTH**
BUSINESS CREDIT

4200 DAHLBERG DRIVE S\_, \_00, MINNEAPOLIS, MN 55422
PHONE: 800/269-4\_\_    FAX: 800/269-4073
LEASING COMPANY ("LESSOR", "WE", "US": WIRTH BUSINESS CREDIT, INC.)

**DESCRIPTION OF LEASED EQUIPMENT – MUST BE COMPLETED**
(include quantity, make, model, serial number and accessories. Attach schedule if necessary)

See Schedule A which is attached and made part of this agreement

Lease Customer Number: 1001745
Lease Number: 11508

**LEASING CUSTOMER ("YOU")**

| | | | | |
|---|---|---|---|---|
| Company Name (Exact business name): Pacific Sun Entertainment, Inc | | | | |
| Address: 19425 Londelius Street | Northridge | | CA | 91324 |
| Street | City | | State | Zip |
| Phone: (818) 357-5440    Fax: | E-mail: sbsardar@gmail.com | | Type of Entity: Corporation | |
| Equipment Location: 19425 Londelius Street, Northridge, CA 91324; Los Angeles County | | | State of Incorporation/Organization: CA | |
| Vendor Name: Sharproduct Inc | | Vendor Address: 3410 Geary Blvd, Suite 341, San Francisco, CA 94118 | | |

**PAYMENT SCHEDULE:**   **PURCHASE OPTION:**

| 48 | 48 | $8,653.03 | $17,306.06 | $.00 | $400.00 | $1 Buy Out |
|---|---|---|---|---|---|---|
| Lease Term (Months) | Total No. of Payments | Amount of each Payment (Including Sales Tax) | Advance Payments (Including Sales Tax) | Security Deposit | Document Fee | at end of lease term |

1. LEASE AGREEMENT AND TERM. You (the customer) want to acquire the above equipment as described above and on one or more Schedules, which are attached and incorporated as part of this Agreement (the "Equipment") from the above vendor. You want us (the leasing company) to buy the Equipment and then lease it to you. This Equipment Lease Contract (the "Lease") is effective from the date it is executed by both parties. The original term of the Lease will commence on the Commencement Date for the number of months from the Commencement Date as set forth above in the Payment Schedule (the "Original Term") and will continue from year to year thereafter until terminated as provided herein (collectively, the "Lease Term"). The "Delivery Date" for the Equipment listed on each Schedule is the earlier of the date we pay for any of the Equipment on such Schedule or the date on which any item of Equipment on such Schedule is delivered to you. The Delivery Date will be determined separately for each Schedule. The "Commencement Date" for a Lease is the first day of the month following the final Delivery Date on the Certificate of Acceptance (or prorated acceptance at our sole discretion). If the first day of the Equipment, unless such Delivery Date falls on the first day of the month in which case that is the Commencement Date. You must notify us by certified mail between 90 and 180 days prior to the end of the Original Term or at the end of any subsequent 12 month lease term if you intend to return the Equipment. If you do not notify us, the Lease will automatically extend for 12 months under the same terms and conditions. To expedite this Lease, you agree that your faxed signature will be considered as good as your original signature and admissible in court as conclusive evidence of this Lease.

2. LEASE CHARGES. You will unconditionally pay us all amounts due, without any right to set-off. You agree that we may adjust your lease payment upward or downward by no more than 15% if the invoiced costs are different than the amount we used to calculate the estimated Lease payments shown above. You understand that we will attempt to automatically deduct each month's regular lease payment in advance on the 1st day of each month. If we do not receive a payment by its due date, there will be a late fee equal to the greater of $20.00 or 15% of the late amount (or if less, the maximum amount allowable under law) which you agree is a reasonable estimate of the costs we incur with respect to late payments and is not a penalty. For each Schedule, we will charge you a partial pro-rated payment for the time between the Delivery Date with respect to such Schedule and the Commencement Date for the Lease. The partial months, you will be charged rent for the number of days beginning on the Delivery Date based on a 30 day month. Advance payments collected will be applied to the last maturing payments in inverse order of their maturity.

3. DELIVERY AND ACCEPTANCE. The Equipment will either be delivered by the vendor or you must arrange for its delivery. When you receive an item of Equipment, you agree to inspect it and determine whether it is in good working order. After inspection, you must contact us to notify of us the date on which the first item of Equipment on a Schedule was delivered to you. You understand that we will contact you after all the Equipment has been delivered to you to complete the Certificate of Acceptance and a delivery and acceptance questionnaire. If we are unable to contact you within two (2) days of your receipt of the Equipment, then you agree that we may conclusively presume that you have examined the Equipment, that the Equipment is in a condition which is satisfactory to you, and that you have unconditionally accepted the Equipment.

4. USE AND MAINTENANCE. You agree that this is a commercial and business transaction. You promise that the Equipment will be used only for business and not for personal, family or household purposes. You will keep and use the Equipment only at the

above address (except as specifically set forth on the Schedule(s) attached hereto) and not move or return it without our written consent. You promise to maintain the Equipment in good working order and keep it in as good a condition as when you received it, less what we consider to be reasonable wear and tear. You must reimburse us for any missing parts or features and excess wear and tear. You are also responsible for any loss, theft or destruction of, or damage to, the Equipment from any cause (a "Loss") whether or not the Equipment is insured. You promise to notify us within ten (10) days of any Loss.

5. OWNERSHIP. You understand that this transaction is a true lease and not a loan transaction. We will own and have title to the Equipment at all times. YOU AGREE THIS IS A "FINANCE LEASE" UNDER ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE ("UCC"). YOU WAIVE ALL UCC RIGHTS AND REMEDIES YOU MAY HAVE, INCLUDING THOSE IN SECTIONS 2A-508 THROUGH 2A-522 OF THE UCC. You grant us a first priority security interest in the Equipment and authorize us to file a UCC financing statement (and if a signature is required, you appoint us as your attorney-in-fact to execute these statements). In the event any portion of a Lease charge is determined to be in the nature of an interest payment subject to a usury law or related prohibition, this Lease will be construed in a manner so that the applicable charge does not exceed the maximum charge allowed by law. Any excess payments will be applied to Lease charges as a prepayment of principal, and any remaining excess will be refunded to you.

6. UNCONDITIONAL LEASE CHARGES. You alone selected the vendor and the Equipment. You asked us to buy it. You acknowledge that either (i) you have either reviewed and approved the written supply contract, or (ii) that we have informed you of the identity of the supplier, that you have rights under any supply contract, and that you may contact the supplier for a description of those rights. We are not related to the vendor and we cannot get a refund, nor is the vendor allowed to waive or modify any term of this Lease. Therefore, the Lease cannot be canceled by you for any reason, even if the Equipment fails or is damaged and it is not your fault. YOU UNDERSTAND THAT YOU MUST PAY ALL LEASE CHARGES WHEN DUE REGARDLESS OF ANY PROBLEMS YOU MIGHT HAVE WITH THE EQUIPMENT, INCLUDING ITS OPERATION, CAPABILITY, INSTALLATION OR REPAIR AND REGARDLESS OF ANY CLAIM, SET-OFF, COUNTER-CLAIM OR DEFENSE YOU MIGHT HAVE AGAINST THE VENDOR, MANUFACTURER, SALESMAN, US OR A THIRD PARTY.

7. DISCLAIMER OF WARRANTIES. WE ARE LEASING THE EQUIPMENT TO YOU "AS IS" AND WE DISCLAIM ALL EXPRESS AND IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. You should contact the vendor to get a statement of those warranties, if any, including any related disclaimers or limitations. We assign to you any warranties the vendor may have given us. You must settle any dispute regarding the Equipment's performance directly with the vendor. CONSISTENT WITH YOUR ASSUMPTION OF ALL EQUIPMENT-RELATED RISKS, YOU WAIVE ANY RIGHTS, DEFENSES AND CLAIMS AGAINST US RELATING TO THE EQUIPMENT THAT ARISE UNDER THE UCC OR ANY APPLICABLE LAW. YOU AGREE THAT YOU WILL NOT MAKE A CLAIM AGAINST US FOR DAMAGES IF THE EQUIPMENT IS NOT PROPERLY INSTALLED, DOES NOT OPERATE AS REPRESENTED OR WARRANTED BY THE VENDOR, OR IS UNSATISFACTORY FOR ANY REASON. YOU ACKNOWLEDGE THAT YOU AND/OR YOUR INDEPENDENT ACCOUNTANTS ARE SOLELY RESPONSIBLE FOR (i) ANY AND ALL YOUR ACCOUNTING AND TAX ENTRIES ASSOCIATED WITH THE LEASE AND/OR THE LEASE SCHEDULES, AND (ii) THE ACCOUNTING AND TAX TREATMENT, BENEFITS, USES AND CLASSIFICATION OF THE LEASE OR ANY LEASE SCHEDULE.

**ADDITIONAL LEASE TERMS AND CONDITIONS ARE SET FORTH ON THE FOLLOWING PAGE AND ARE A PART OF THIS LEASE.**

ACCEPTANCE OF EQUIPMENT LEASE CONTRACT:
THIS IS A BINDING CONTRACT. IT CANNOT BE CANCELED. READ IT CAREFULLY BEFORE SIGNING, AND CALL US IF YOU HAVE ANY QUESTIONS.

| X | _(signature)_ | SAEED SARDAR | VP/CFO | 12/7/07 |
|---|---|---|---|---|
| | Signature of Lessee (Customer) | Print Name of Signer | Title | Date |
| X | _(signature)_ | Bill Andyson | UP - Credit | 12/7/07 |
| | Accepted and Signed by Wirth Business Credit, Inc. | Print Name of Signer | Title | Date |

2 of 9

**WIRTH**
BUSINESS CREDIT

EQUIPMENT LEASE CONTRACT
4200 DAHLBERG DRIVE SUITE 100, MINNEAPOLIS, MN 55422
PHONE: 800/269-4073 • FAX: 800/269-4073
LEASING COMPANY ("LESSOR", "WE", "US": WIRTH BUSINESS CREDIT, INC.)

## ADDITIONAL LEASE TERMS AND CONDITIONS

**8. TAXES.** You must pay us for all sales, use, property and other taxes (and any penalties) relating to the Lease and the Equipment. Certain governmental authorities require such sales tax to be paid at inception. Unless you request an alternative arrangement in writing, we will finance such amounts over the remaining term of the Lease. Unless we have given you a written option to buy the Equipment at the end of the Lease for $1.00, we will be entitled to all tax benefits. If you do anything to disallow our getting those benefits, you will promptly indemnify (pay) us an equivalent amount. You acknowledge that we have not made any representations or statements relating to accounting, the tax treatment or classification of this Lease.

**9. DEFAULT.** You will be in default if any of the following occurs (each of the following is a "Default"): (i) you do not pay us as agreed; (ii) you fail to perform any other obligation under this Lease; (iii) you assign, pledge, sublease, allow another to use, sell or lose possession of the Equipment or attempt to do so without our prior written authorization; (iv) your financial condition changes to the point where it reasonably causes us to be insecure about your willingness or ability to perform your obligations under the Lease or any other agreement with us; (v) you or your guarantor dies, becomes insolvent or unable to pay debts when they become due, stops doing business as a going concern, proposes, sells or transfers all or substantially all of its assets, makes an assignment for the benefit of creditors, appoints a trustee or receiver or undergoes a substantial deterioration of financial health; (vi) any guarantor of any obligations hereunder is the subject of an event listed in clauses (i) – (vi); (vii) you or your guarantor fails to assume this Lease obligations within 60 days of the filing of any petition for protection under the United States Bankruptcy Code; (viii) the termination, expiration (without immediate renewal), default, breach, assignment or revocation of any franchise agreement to which you are a party; or (ix) a default under any other lease, agreement, instrument, document or guaranty executed with and us (each of the foregoing is a "Default").

**10. REMEDIES.** If a Default occurs, we may at our option do one or more of the following: (i) we may, without notice, directly debit (charge) your bank account(s) and/or sue you for all past due payments and other charges and all payments due in the future to the end of the Lease Term, plus our legal and collection costs, and if you are in Default and/or do not meet your end of term obligations, we may also directly debit your bank account and/or sue you for the "residual" (end of term) Equipment value; (ii) we may, without notice, cancel or terminate all of your rights, but not your obligations, associated with the Lease; (iii) we may immediately retake possession of the Equipment without any court order or other process of law; and/or (iv) we may exercise any remedy at law or equity, notice thereof being expressly waived by you and your guarantor. If we retake the Equipment, we may sell, lease or otherwise dispose of it in a commercially reasonable manner, with or without notice, at a public or private sale and apply the net proceeds to the amount you owe us. If the net proceeds do not pay us everything you owe us, you are liable for the difference.

**11. REDELIVERY OF EQUIPMENT.** Provided you have fulfilled all of your obligations to us under this Lease through the expiration of the Original Term, you may exercise the Purchase Option, if any, selected above by notifying us in writing between 90 and 180 days prior to the expiration of the Original Term. If you exercise a Purchase Option, you agree to purchase all, but not less than all, of the Equipment that is in place and in use at your location. In the event you do not decide to purchase the Equipment according to the terms of any Purchase Option selected above, then when this Lease expires, or is terminated earlier, you shall at your expense disconnect, properly package for transportation and return the Equipment to us in good repair, condition and working order, normal wear and tear excepted, to a location designated by us. If upon expiration or termination you do not immediately return the Equipment to us, at our option (i) we will remove the Equipment at your expense, and you agree to pay us an additional amount equal to a minimum of 2 monthly payments, or (ii) the Equipment will continue to be held and leased by you for successive one-year periods at the same monthly payment in this Lease, subject to the right of either party to terminate the Lease upon 12 months written notice. At the end of the 12 months, you will deliver the Equipment to us under the terms of this paragraph, provided that we retain the right, in our sole discretion, to limit the total number of such successive one-year renewals to protect our tax benefits as the owner of the Equipment.

**12. SECURITY DEPOSIT.** You agree to reimburse us for our costs to refurbish returned Equipment. You agree the security deposit will not bear interest and that we may apply it to any amount owed to us, and should we do so, you agree to restore the security deposit to its original amount. You may request the return of the security deposit only after all of your obligations under this Lease have been met in full. Provided you have fulfilled all of your obligations to us under the Lease, we will either refund your security deposit to you or at your direction apply it towards the purchase of the Equipment.

**13. LESSEE REPRESENTATION.** Lessee represents and warrants that the value of the assets leased under this Agreement does not exceed 50% of the total of (i) fair market value of the equity of the Lessee; (ii) the total outstanding debt of the Lessee; and (iii) the value of the assets leased under this Agreement.

**14. LEGAL ACTIONS.** This Lease shall be governed by the internal laws (as opposed to conflicts of law provisions) of the State of Minnesota where we have an office and accept this Lease. You agree that any suit under this Lease shall be brought in state or federal court located in Hennepin County, Minnesota. You irrevocably consent and submit to the exclusive jurisdiction of such courts and waive local venue with respect to claims arising under this Lease. Each party waives any right to a jury trial. You agree that any process served for any action or proceeding shall be valid if mailed by certified mail, return receipt requested, with delivery restricted to you, your registered agent or any agent appointed in writing to accept such process

**15. INDEMNITY.** You accept all risks of loss, injury or damage caused by the Equipment and must indemnify us and hold us harmless for all suits and other liabilities arising from the same. This indemnity will continue even after the Lease has ended.

**16. INSURANCE.** You must maintain acceptable public liability insurance naming us as "additional insured." You must maintain property insurance to insure the Equipment against all risks of loss in an amount equal to the replacement cost and have us listed on the policy as "loss payee." If you do not give us proof of the property insurance, then depending on the original cost of the Equipment, we may either (i) obtain property insurance to cover our interests and charge you a fee for such coverage or (ii) charge you a monthly non-compliance fee up to $50.00 (which provides no insurance benefit). You can stop the insurance coverage fee or non-compliance fee at any time by delivering the required proof of insurance. You appoint us as attorney-in-fact to make claims for, receive payment of, any execute and endorse all documents, checks or drafts for loss, theft, damage or destruction to the Equipment. We may elect how to apply insurance proceeds.

**17. CREDIT INFORMATION.** You authorize us to obtain credit information and to obtain credit bureau reports and make other credit inquiries that we determine are necessary.

**18. ASSIGNMENT.** This Lease will be binding on and inure to the benefit of the parties hereto and their respective successors and assigns. Since this Lease is based on your own credit strength, you may not assign (transfer) the Lease to anyone else. We may sell or transfer our interests to another entity who will then have all of our rights but none of our obligations, unless those obligations are specifically assumed. In that case, those obligations will continue to be ours. The rights we pass on to the new entity will not be subject to any defenses, claims or set-offs you may assert against us. Any action by you against us must be commenced within one year after the cause of action arises or be forever barred.

**19. SURVIVAL OF TERMS.** All agreements, indemnities, promises, representations and warranties made by you in this Lease, or in any certificate, schedule, statement or other document furnished in connection with the negotiation, execution and performance of this Lease, shall survive the expiration, termination, cancellation or assignment of this Lease.

**20. ENTIRE AGREEMENT.** This Lease constitutes the entire agreement between you and us with respect to your leasing the Equipment, and it supersedes all prior discussions, correspondence or communications between us.

**21. AUTHORITY TO SIGN.** You acknowledge and represent that the person signing this Lease has the authority to do so, to bind the entity, and to grant the power of attorney under this Lease.

**22. AUTHORIZATION FOR AUTOMATIC PAYMENT.** All payments under this Lease shall be through the use of an automatic payment deducted from your checking or savings account. I authorize Wirth Business Credit, Inc., its assigns, affiliates and agents and the financial institution named below to initiate entries to my checking/savings account. This authority will remain in effect as long as this contract is in effect. I agree to indemnify Wirth Business Credit, Inc., its agents and the financial institution for any loss or cost arising in the event that any such debit shall be dishonored, whether with or without cause and whether intentionally or inadvertently

Name of Financial Institution _____ Branch _____

Address _____

City _____ State ___ Zip ___

REDACTED

☐ Checking  ☐ Savings

Routing Number (Between |: |: on the bottom left of your check) _____

Initials of Leasing Customer _____

3 of 9



SCHEDULE "A" – EQUI     ENT DESCRIPTION
4200 DAHLBERG DRIVE SUITE 10u, MINNEAPOLIS, MN 55422
PHONE: 800/269-4075  •  FAX: 800/269-4073

Lease Customer Number:   1001745

Lease Number:            11508

Vendor Name:             Sharproduct Inc

This Schedule "A" is attached to and a part of the Equipment Lease Contract by and between the above leasing customer and Wirth Business Credit, Inc. relating to the lease transaction referenced above. All of the terms and conditions of the Equipment Lease Contract are incorporated herein and made a part hereof. The following is a full and complete description of the leased equipment:

| Quantity | Equipment Type | Make & Model | Serial # |
|----------|----------------|--------------|----------|
| | See Schedule A-1, which is attached and made part of this Equipment Lease Contract | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

This Equipment Lease Schedule also covers any and all present and future replacement equipment, substituted equipment, additional equipment, trade-ups and add-ons without requiring a separate agreement. (However, the leasing customer understands that Wirth Business Credit, Inc. consent will be required for any of these.)

The leasing customer agrees that a facsimile of this document or the signature shall be as valid and binding as the original and will be admissible in court as conclusive evidence of this document.

_____
Signature of Leasing Customer

Accepted by Wirth Business Credit, Inc.

_____
Date

10/11/07
_____
Date

4 of 9

Schedule A-1

**Sharproduct Inc.**

3410 Geary Blvd, Suite 341
San Francisco, Ca 94118
Tel (415) 831-8828

*Old*

DATE: November 16, 2007
INVOICE # 7865955

Bill To: Wirth Business Credit

Ship To: Saeed Sardar
Pacific Sun Entertainment Inc.
19425 Londelius Street
Northridge, CA
Tel: (818)357-5440

| REP | PROJECT | P.O. NUMBER | SHIP DATE | SHIP VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|---|
| | | 7865955 | | | | Due on receipt |

| QUANTITY | ITEM | DESCRIPTION | | | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 6 | SYS | CGA Reliant WS7016 Intel Xeon Processor MP & Rack-Mount. Four (4) Intel Xeon MP 2.00G/2/2MB Processors. 4GB Addressable memory (6x512MB+2x512MB) Redundant Memory. 36.4G Pluggable Ultra320 SCSI 10,000 rpm Universal Hard Drive (1"). Integrated Smart Array 5i Controller (Ultra 3 Support). Integrated Compaq NC7770 PCI-X Gigabit Server Adapter. Two (2) Redundant Hot Plug 1150W/500W Power Supplies. Two (2) Redundant Hot Plug Fans. Intelli-Initiate 3.0, Core Manager 2.0 & ROM based Setup Utility. SP0509002943, SP0509002944, SP0509002945, SP0509002946, SP0509002947, SP0509002948 | | | $ 47,570.00 | $ 285,420.00 |
| 6 | MT_LCD19 | MAG A710B 17" LCD MONITOR w/SPEAKER | | | 341.00 | 2,046.00 |
| 6 | RECYCLE | RECYCLE FEE | | | 8.00 | 48.00 |
| 1 | Labor | Service Fee for Delivery and Set Up | | | 6,000.00 | 6,000.00 |
| 1 | On-Site | On-site services | | | 2,500.00 | 2,500.00 |

SUBTOTAL $ 296,014.00
TAX RATE 8.50% *8.25%*
SALES TAX 25,101.19 *24,421.16*
SHIPPING & HANDLING
TOTAL $ 321,115.19 *320,435.16*

Any item purchased from Sharproduct Inc. is returnable at our exchange within SEVEN DAYS from the date of purchase. The original INVOICE must be presented for return or exchange. A 20% RESTOCKING FEE will be applied to ALL REFUNDS with no exceptions. All individual parts have a limited one-year warranty from Sharproducts. The warranty does not cover acts of God, fire, electrical short-circuits, viruses, physical damage or abuse. A fully configured computer system has a one-year in-store warranty on parts and labor. Warranty does not cover incompatibility problems and/or hardware/software installed by customers themselves.

Make all checks payable to Sharproduct Inc.

If you have any questions concerning this invoice, feel free to contact us at (415) 831-8828.

THANK YOU FOR YOUR BUSINESS

5 of 9

# WIRTH

**BUSINESS CREDIT**

PERSONAL GUARANTY
4200 DAHLBERG DRIVE SUITE 100, MINNEAPOLIS, MN 55422
PHONE: 800/269-4075 • FAX: 800/269-4073

| Lease Customer Number: | 1001745 |
| Lease Number: | 11508 |
| Vendor Name: | Sharproduct Inc |

The person signing below (the "Guarantor") intends to be legally bound by this document and understands that it cannot be revoked or cancelled. Guarantor also understands that he or she is entering into a personal financial obligation in favor of Wirth Business Credit, Inc. Guarantor represents that he or she is one of the owners, officers or directors of the leasing customer or will otherwise benefit from the lease. Guarantor also knows that Wirth Business Credit, Inc. would not enter into the lease without first obtaining this personal guaranty.

In exchange for Wirth Business Credit, Inc. entering into the lease, Guarantor hereby individually, personally, and absolutely and unconditionally guarantees to Wirth Business Credit, Inc. the prompt payment of all lease payments, lease charges and other amounts owed by the Leasing Customer to Wirth Business Credit, Inc., including but not limited to, costs of enforcement of the lease and attorneys fees of Wirth Business Credit, Inc. (collectively, the "Obligations"). This guaranty shall continue until all of the Obligations have been fully satisfied. This guaranty shall not be subject to any right of set-off, recoupment, deduction or other defense. Guarantor represents that he or she has read the Equipment Lease Contract and understands all of its terms.

Guarantor agrees that Wirth Business Credit, Inc. may proceed against him or her to enforce this guaranty without first proceeding against the Leasing Customer, and also agrees that this guaranty will be enforceable even if the Leasing Customer goes out of business or into bankruptcy or otherwise cannot or does not pay for any reason. Settlements, renewals, extensions of time and other modifications of the lease shall be binding on Guarantor. Guarantor waives diligence, presentment, demand, protest or notice of any kind whatsoever as to this guaranty. Guarantor agrees to be subject to suit in the Minnesota courts and hereby consents to the exclusive jurisdiction of such courts and waives local venue with respect to claims arising hereunder. Guarantor agrees that a facsimile of this document and the signature shall be as valid and binding as the original and will be admissible in court as final evidence of this guaranty.

_____
Signature of Guarantor

Saeed Sardar
_____
Print Name

1387 Lejene Ct
_____
Home Address

| San Jose | CA | 95131 |
| City | State | Zip |

REDACTED
_____
Social Security #

_____
Home Phone #

6 of 9

# WIRTH )

BUSINESS CREDIT

CERTIFICATE ~  ACCEPTANCE
4200 DAHLBERG DRIVE SUITE .  MINNEAPOLIS, MN 55422
PHONE: 800/269-4075  •  FAX: 800/269-4073

Leasing Customer Number:    1001745

Lease Application Number :    11508

Vendor Name:                Sharproduct Inc

Equipment Description:      See each Schedule attached to the Equipment Lease Contract and made part thereof.

The above Leasing Customer hereby represents and certifies to Wirth Business Credit, Inc. as follows:

1.  The equipment described above has been fully delivered to the Leasing Customer, has been fully installed, has been inspected and tested by the Leasing Customer, and is working perfectly. Therefore, Leasing Customer accepts the equipment.

2.  The Leasing Customer understands that Wirth Business Credit, Inc. will not be able to get a refund after the equipment is purchased. The Leasing Customer hereby acknowledges having signed an Equipment Lease Contract and understands that it cannot be revoked or cancelled for any reason.

3.  To expedite this transaction for the Leasing Customer, the Leasing Customer agrees that a facsimile of this document and a facsimile of the Leasing Customer's signature shall be considered as valid and binding as the original and will be admissible in a court of law as conclusive evidence of this transaction. Leasing Customer authorizes Lessor, as Leasing Customer's attorney-in-fact, to complete this Certificate of Acceptance by supplying the information set forth below, including without limitation, the delivery date of the Equipment.

_____                    12/9/09
Authorized Signature of Leasing Customer                    Date

SAEED SARDAR  V-P/CFO
Print Name and Title

7 of 9



**AMENDMENT TO EQUIP..NT LEASE CONTRACT**
4200 DAHLBERG DRIVE SUITE 100, MINNEAPOLIS, MN 55422
PHONE: 800/269-4075 • FAX: 800/269-4073

Leasing Customer Number:    1001745

Lease Application Number :    11508

This Amendment to the Equipment Lease Contract ("Lease") by and between <u>Pacific Sun Entertainment, Inc</u> ("Lessee") and Wirth Business Credit, Inc., a Minnesota corporation ("Lessor") is dated this <u>14</u> day of <u>DEC</u>, 2007.

The parties hereby agree as follows:

1. **PAYMENT SCHEDULE:**

| | | | | | | **PURCHASE OPTION:** |
|---|---|---|---|---|---|---|
| 48<br>Lease Term<br>(Mos.) | 48<br>Total No. of<br>Payments | $8,653.03<br>Amount of each<br>Payment<br>(Including Sales Tax) | $17,306.06<br>Advance Payments<br>(including Sales Tax) | $.00<br>Security Deposit | $150.00<br>Document Fee | $1 Buy Out<br>at end of lease term. |

2. **SCHEDULE A: EQUIPMENT DESCRIPTION**

| QUANTITY | EQUIPMENT TYPE | MAKE & MODEL | SERIAL NUMBER |
|---|---|---|---|
| | | Equipment has been changed from Schedule A-1 to Schedule B-1 (attached) | |
| | | | |
| | | | |
| | | | |

3. The terms and conditions of the Lease are hereby amended as set forth above. Except as set forth above, the terms and conditions of the Equipment Lease Contract shall remain in full force and effect.

4. The parties agree that facsimile signatures shall be deemed original signatures for the purposes of this Amendment.

**ACCEPTANCE OF AMENDMENT**

| | | | |
|---|---|---|---|
| X _____<br>Signature of Leasing Customer | SAEED SARDAR<br>Print Name of Signer | V.P/CFO<br>Title | 12/14/07<br>Date |
| X _____<br>Accepted and Signed by Wirth Business Credit, Inc. | B.// Anderson<br>Print Name of Signer | VP-Credit<br>Title | 12/14/07<br>Date |

_____
Initials        Pursuant to paragraph 2 of the Lease.

# Sharproduct Inc.

3410 Geary Blvd, Suite 341
San Francisco, Ca 94118
Tel (415) 831-8828

*New*

| DATE: | November 16, 2007 |
|---|---|
| INVOICE # | 7865955 |

**Bill To:**
Trish Glodowski
Wirth Business Credit
4200 Dahlberg Drive St#100
Minneapolis, MN , 55422
Tel: 763-520-8647

**Ship To:**
Saeed Sardar
Pacific Sun Entertainment Inc.
19425 Londelius Street
Northridge, CA
Tel: (818)357-5440

| REP | PROJECT | P.O. NUMBER | SHIP DATE | SHIP VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|---|
|  |  | 7865955 |  |  |  | Due on receipt |

| QUANTITY | ITEM | DESCRIPTION | | | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 6 | SYS | CGA Reliant WS7010 Intel Xeon Processor MP & Rack-Mount. Four (4) Intel Xeon MO 2.00GZ/2MB Processors. 4GB Addressable memory (6x512MB+2x512MB Redundant Memory. 36.4G Pluggable Ultra320 SCSI 10,000 rpm Universal Hard Drive (1"). Integrated Smart Array 5I Controller (Ultra 3 Support). Integrated Compaq NC7770 PCI-X Gigabit SErver Adapter. Two (2) Redundal Hot Plug 1150W/500W Power Supplies. Two (2) Redundant Hot Plug Fans. Intelli-Initiate 3.0, Core Manager 2.0 & ROM_based Setup Utility.  SP0509002937, SP0509002038, SP0509002939, SP0509002940, SP0509002941, SP0509002942 | | | $  47,570.00 | $   285,420.00 |
| 6 | MT_LCD19 | MGC A710B 19" LCD MONITOR w/SPEAKER | | | 341.00 | 2,046.00 |
| 6 | RECYCLE | RECYCLE FEE | | | 8.00 | 48.00 |
| 1 | Labor | Service Fee for Delivery and Set Up | | | 6,000.00 | 6,000.00 |
| 1 | On-Site | On-site services | | | 2,500.00 | 2,500.00 |

|  |  |
|---|---|
| SUBTOTAL | $  296,014.00 |
| TAX RATE | 0.00% |
| SALES TAX | - |
| SHIPPING & HANDLING |  |
| TOTAL | $  296,014.00 |

Any item purchased from Sharproducts Inc. is returnable and/or exchangable within SEVEN DAYS from the date of purchase. The original INVOICE must be presented for return or exchange. A 20% RESTOCKING FEE will be applied to ALL REFUNDS with no exception. All individual parts have a limited one-year warranty from Sharproducts. The warranty does not cover acts of God, fire, electrical short-circuits, viruses, physical damage or abuse. A fully configured computer system has a one-year in-store warranty on parts and labor. Warranty does not cover incompability problems and/or hardware/software installed by customers themselves.

Make all checks payable to Sharproduct Inc.

If you have any questions concerning this invoice, feel free to contact us at (415) 831-8828.

THANK YOU FOR YOUR BUSINESS!

# EXHIBIT 6

## JCC FINANCING STATEMENT

OLLOW INSTRUCTIONS (front and back) CAREFULLY

| | | |
|---|---|---|
| **. NAME & PHONE OF CONTACT AT FILER [optional]** | | |
| 763-520-8422 | | |

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Wirth Business Credit, Inc.
4200 Dahlberg Drive
Suite 100
Minneapolis, MN 55422
USA

DOCUMENT NUMBER: 15147960002
FILING NUMBER: 07-7139885159
FILING DATE: 12/12/2007 07:26
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR  PACIFIC SUN ENTERTAINMENT, INC. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| | | | | |

| c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9425 Londelius Street | Northridge | CA | 91324 | USA |

| d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Corporation | CA | C2169545        ☐ NONE |

. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| | | | | |

| c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR  Wirth Business Credit, Inc. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| | | | | |

| c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4200 Dahlberg Drive, Suite 100 | Minneapolis | MN | 55422 | USA |

. This FINANCING STATEMENT covers the following collateral:

- SYS - CGA Reliant WS7010 Intel Xeon Processor MP & Rack-Mount. Four (4) Intel Xeon MO 2.00GZ/2MB Processors. 4GB Addressable memory
8x512MB+2x512MB Redundant Memory). 36.4G Pluggable Ultra320 SCSI 10,000 rpm Universal Hard Drive (1"). Integrated Smart Array 5i
Controller (Ultra 3 Support). Integrated Compaq NC7770 PCI-X Gigabit Server Adapter. Two (2) Redundant Hot Plug 1150W/500W Power
Supplies. Two (2) Redundant Hot Plug Fans. Intelli-Initiate 3.0, Core Manager 2.0 & ROM_based Setup Utility. SP0509002943, SP0509002044, SP0509002945, SP0509002946, SP0509002947, SP0509002948.

- MT_LCD10 - MGC A710B 17" LCD MONITOR w/SPEAKER

| . ALT DESIGNATION: | ☑ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or ecorded) in the REAL ESTATE RECORDS  Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]  ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|

. OPTIONAL FILER REFERENCE DATA

1508

ILING OFFICE COPY

# JCC FINANCING STATEMENT AMENDMENT

OLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

763/520-8422

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Wirth Business Credit, Inc.
4200 Dahlberg Drive
Suite 100
Minneapolis, MN 55422
USA

DOCUMENT NUMBER: 15184290003
FILING NUMBER: 07-71402756
FILING DATE: 12/14/2007 11:21
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

a. INITIAL FINANCING STATEMENT FILE #

07-7139885159

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

1 - SYS - CGA Reliant WS7010 Intel Xeon Processor MP & Rack-Mount. Four (4) Intel Xeon MO 2.00GZ/2MB Processors. 4GB Addressable
Memory (8x512MB+2x512MB Redundant Memory). 36.4G Pluggable Ultra320 SCSI 10,000 rpm Universal Hard Drive (1"). Integrated Smart Array
6i Controller (Ultra 3 Support). Integrated Compaq NC7770 PCI-X Gigabit Server Adapter. Two (2) Redundant Hot Plug 1150W/500W Power
Supplies. Two (2) Redundant Hot Plug Fans. Intelli-Initiate 3.0, Core Manager 2.0 & ROM_based SEtup Utility. SP0509002937, SP0509002938, SP0509002939, SP0509002940, SP0509002941, SP0509002942

1 - MT_LCD19 - MGC A710B 19" LCD Monitor w/Speaker

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR Wirth Business Credit, Inc. | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY